IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PAMELIA DWIGHT, an individual;
BENJAMIN DOTSON, an individual;
HUDMAN EVANS, SR., an individual; and
MARION WARREN, an individual,

        Plaintiffs,

v.

BRIAN KEMP, in his official capacity as
Secretary of State of the State of Georgia,

        Defendant.

CIVIL ACTION NO. _____

## COMPLAINT

1.    Plaintiffs bring this action to challenge the Georgia General Assembly's congressional redistricting plan, Act No. 3EX ("H.B. 20EX"), which has diluted African-American voting strength and denied African-American voters in Georgia the opportunity to elect their candidates of choice, in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

2.    Between the 2000 and 2010 Censuses, the state of Georgia saw a significant increase in its African-American, Latino, and Asian populations.

Minorities accounted for over 80 percent of the state's total population growth during this period, which allowed Georgia to obtain a 14th congressional seat.

3.     In response to the state's changing demographics, the Georgia General Assembly passed a 2011 congressional redistricting plan which would ensure that the rapid growth in its minority population did not translate to increased minority voting strength or political influence.

4.     By 2010, African Americans in Georgia were sufficiently numerous and geographically compact to form a majority of eligible voters in an additional congressional district in or around the 12th Congressional District ("CD 12"). But rather than draw CD 12 as a district in which African Americans would have the opportunity to elect their preferred candidates, the General Assembly excised African-American voters in Savannah, while adding white voters from Richmond County and Columbia County to the north. This reduced the Black voting age population ("BVAP") in CD 12 from 41.5 percent to 33.3 percent. The plan then dispersed geographically compact African-American communities into surrounding Districts 1, 8, and 10, leaving those districts with respective BVAPs of 28.9 percent, 28.5 percent, and 24.1 percent.

5.     Section 2 of the Voting Rights Act ("Section 2") required the General Assembly to draw an additional congressional district in or around CD 12 in which

African-American voters would have an opportunity to elect their candidates of choice.

6.      By failing to create such a district, the General Assembly's response to Georgia's changing demographics had the effect of diluting African-American voting strength in or around CD 12, denying those voters an equal opportunity to participate in the political process.

7.      Accordingly, Plaintiffs seek an order (i) declaring that H.B. 20EX violates Section 2 of the Voting Rights Act; (ii) enjoining Defendant from conducting future elections under H.B. 20EX; (iii) ordering a valid plan for new congressional districts in Georgia that comports with Section 2 of the Voting Rights Act; and (iv) providing any and such additional relief as is appropriate.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357.

9.      This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

10.      Venue is proper under 28 U.S.C. § 1391(b).

# PARTIES

11.    Plaintiff PAMELIA DWIGHT is an African-American citizen of the United States and of the State of Georgia. She is a resident of Jenkins County in CD 12 and has been registered to vote since 1998. Ms. Dwight has been unable to elect candidates of her choice to the U.S. House of Representatives despite strong electoral support for those candidates from other African-American voters in her community. Ms. Dwight resides in Jenkins County, which is within CD 12, and is located in a region where the African-American community is sufficiently large and geographically compact to constitute a majority of eligible voters in an additional congressional district in which African Americans would have the opportunity to elect their preferred candidates. The General Assembly's redistricting plan resulted in the dilution of Ms. Dwight's voting power and denied her an equal opportunity to elect a candidate of her choice to the U.S. House of Representatives.

12.    Plaintiff BENJAMIN DOTSON is an African-American citizen of the United States and of the State of Georgia. He has been a resident and registered voter in Washington County in CD 10 since 2000. Mr. Dotson has been unable to elect candidates of his choice to the U.S. House of Representatives despite strong electoral support for those candidates from other African-American voters in his community. Mr. Dotson resides in Washington County, which is north of the current boundary

for CD 12, and is located in a region where the African-American community is sufficiently large and geographically compact to constitute a majority of eligible voters in an additional congressional district in which African Americans would have the opportunity to elect their preferred candidates. The General Assembly's redistricting plan resulted in the dilution of Mr. Dotson's voting power and denied him an equal opportunity to elect a candidate of his choice to the U.S. House of Representatives.

13. Plaintiff HUDMAN S. EVANS, SR. is an African-American citizen of the United States and of the State of Georgia. He is a resident of Baldwin County in CD 10, and has been registered to vote for over 50 years. Mr. Evans has been unable to elect candidates of his choice to the U.S. House of Representatives despite strong electoral support for those candidates from other African-American voters in his community. Mr. Evans resides in Baldwin County, which is north of the current boundary for CD 12, and is located in a region where the African-American community is sufficiently large and geographically compact to constitute a majority of eligible voters in an additional congressional district in which African Americans would have the opportunity to elect their preferred candidates. The General Assembly's redistricting plan resulted in the dilution of Mr. Evans' voting power

and denied him an equal opportunity to elect a candidate of his choice to the U.S. House of Representatives.

14.    Plaintiff MARION WARREN is an African-American citizen of the United States and of the State of Georgia. He has been a resident and registered voter in Hancock County in CD 10 since 1978. Mr. Warren has been unable to elect candidates of his choice to the U.S. House of Representatives despite strong electoral support for those candidates from other African-American voters in his community. Mr. Warren resides in Hancock County, which is north of the current boundary for CD 12, and is located in a region where the African-American community is sufficiently large and geographically compact to constitute a majority of eligible voters in an additional congressional district in which African Americans would have the opportunity to elect their preferred candidates. The General Assembly's redistricting plan resulted in the dilution of Mr. Warren's voting power and denied him an equal opportunity to elect a candidate of his choice to the U.S. House of Representatives.

15.    Defendant Brian Kemp is Georgia's Secretary of State and is named solely in his official capacity as such. As Secretary of State, Brian Kemp is Georgia's chief election official. In that capacity, he is responsible for promoting and supporting accurate, fair, open and secure elections for the citizens of Georgia and

for implementing election laws and regulations, including the congressional redistricting plan at issue in this litigation. *See* Ga. Code Ann. § 21-2-50(b); Ga. Comp. R. & Regs. 590-1-1-.01, .02.

## LEGAL BACKGROUND

16.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" Thus, in addition to prohibiting practices that deny the exercise of the right to vote, Section 2 prohibits vote dilution. A violation of Section 2 is established if "it is shown that the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by members of a [minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b).

17.     The dilution of African-American voting strength "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

18.     The United States Supreme Court, in *Thornburg v. Gingles*, identified three necessary preconditions for a claim of vote dilution under Section 2 of the

Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51.

19.    Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors that courts should consider when determining if, under the totality of circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

20.    These Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and

prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

21.     The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* at 1566 ("The statute explicitly calls for a 'totality-of-the-circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

## FACTUAL BACKGROUND

22.     From 2000 to 2010, Georgia's population increased by more than 1.5 million. Over 80 percent of the population growth during that period is attributable to the increase in Georgia's minority population. The 2010 Census indicates that

Georgia's African-American population grew by over 25 percent and now comprises more than 30 percent of Georgia's total population.

23.     Because of its rapid population growth, Georgia gained a 14th congressional district following the 2010 Census.

24.     On August 31, 2011, the Republican-controlled General Assembly passed H.B. 20EX, which adopted a new congressional redistricting plan that revised existing congressional district boundaries and added a 14th district. On September 6, 2011, Governor Deal signed H.B. 20EX into law.

25.     Although Georgia gained its 14th congressional district largely because of the growth of its African-American and other minority populations, the new district created under H.B. 20EX—referred to as CD 9—has the smallest African-American population of any district in the state.

26.     Rather than create additional districts in which Georgia's growing African-American population would have the opportunity to elect candidates of their choice, the Republican-controlled General Assembly did just the opposite: it cracked politically cohesive and geographically compact African-American communities to dilute their influence in what was originally a competitive district, CD 12.

27.     In particular, the General Assembly diluted African-American voting strength in and around CD 12 by moving Savannah—and the bulk of its African-

American population—out of that district, and into CD 1, while expanding CD 12 to the north to capture white voters in Richmond County and Columbia County. As a result, BVAP in CD 12 decreased from 41.5 percent to 33.3 percent. And under the new congressional district map, a Republican candidate defeated the African-American community's candidate of choice, Democratic incumbent John Barrow, in the 2014 congressional election, which gave Republicans the CD 12 seat for the first time since 2004.

28.    Democratic African-American legislators were largely excluded from the redistricting process. In February 2011, Republican leaders created the Legislative and Congressional Reapportionment Office (the "Office"), which the General Assembly's website describes as a "Joint Office . . . responsible for providing the General Assembly with redistricting services," and retained Ann Lewis, counsel to the state Republican Party, to provide legal guidance to the Office. Georgia Gen. Assembly, Joint Offices, Reapportionment, http://www.legis.ga.gov/Joint/reapportionment/en-US/default.aspx.

29.    Although the Office was required to provide services to both parties, Republican legislators did not initially inform Democrats of its creation. African-American House Democratic leader Stacey Abrams expressed concern that the unilateral creation of the Office "raise[d] some serious questions about transparency

and accountability." African-American Senate Democratic leader, Robert Brown, called the creation of the Office "very much a surprise." Shannon McCaffrey, *Georgia GOP, Democrats argue over redistricting effort*, SAVANNAHNOW (Feb. 4, 2011), http://savannahnow.com/news/2011-02-04/georgia-gop-democrats-argue-over-redistricting-effort.

30.   Receiving little to no support from African-American legislators, H.B. 20EX passed both the House of Representatives and the Senate along racial lines. In the House, 40 out of 41 African-American representatives voted against the plan; and in the Senate, not a single African-American senator voted in favor. Notably, African-American Congressman and civil rights icon, John Lewis, described the congressional redistricting map as "an affront to the spirit and the letter of the Voting Rights Act." Aaron G. Sheinin, *GOP redistricting plan would tighten grip on congressional delegation*, ATLANTA J. CONST., (Aug. 23, 2011), http://www.ajc.com/news/local-govt--politics/gop-redistricting-plan-would-tighten-grip-congressional-delegation/7pf5U0xghjknRgzQUW7O8O/.

31.   H.B. 20EX has denied—and unless enjoined will continue to deny— African Americans in or around CD 12 the opportunity to elect candidates of their choice by excising large swaths of African-American voters from majority-white

districts, while importing white voters to dilute the voting strength of the remaining African-American population.

32.     African-American voters in and around CD 12 are sufficiently numerous and geographically compact to comprise a majority of eligible voters in an additional congressional district.

33.     By reversing the dilution of African-American votes in or around CD 12, the Republican-controlled General Assembly could have created another congressional district in which African Americans would have the opportunity to elect their preferred candidates, as required by Section 2 of the Voting Rights Act.

## Racial Polarization

34.     This Court has recognized that "voting in Georgia is highly racially polarized," and "[d]istricts with large black populations are likely to vote Democratic." *Ga. State Conference of NAACP v. Georgia*, --- F. Supp. 3d ---, 2018 WL 2459168, at *2 (N.D. Ga. 2018).

35.     African-American voters in Georgia are politically cohesive, and overwhelmingly support Democratic candidates.

36.     Georgia currently has four African-American representatives in Congress. Three were elected in majority-minority congressional districts. The fourth African-American Congressman, Sanford Bishop, is an incumbent who was

elected in a district in which African Americans comprise 49.5 percent of the voting age population and 50.1 percent of registered voters.

37.    The white majority, which overwhelmingly supports Republican candidates, usually votes as a bloc to defeat African-American voters' candidates of choice, particularly in areas within or near CD 12.

38.    Of the 119 Republicans in the Georgia House of Representatives, none are African American.

39.    Forty-six of the 61 Democrats in the Georgia House are African American, the vast majority of whom were also elected in majority-minority districts.

### History of Discrimination

40.    Georgia's history of discrimination against African Americans, and the state's numerous attempts to deny African-American voters an equal opportunity to participate in the political process, is extensive and well documented.

41.    This history dates back to the post-Civil War era, when African Americans in Georgia first gained the right to vote and voted in their first election in April 1868. Soon after this historic election, a quarter of the state's African-American legislators were either jailed, threatened, beaten, or killed, and, in 1871, the Georgia General Assembly passed a resolution that expelled 25 African-

American representatives and three senators, but permitted the four mixed-race members of the General Assembly who did not "look" African American to keep their seats. The General Assembly's resolution was based on the grounds that the right of African Americans to vote did not give them the right to hold office, and African Americans were thus "ineligible" to serve under Georgia's post-Civil War state constitution.

42.    After being denied the right to hold office, African Americans who attempted to vote also encountered intense and frequently violent opposition. The Ku Klux Klan and other white mobs engaged in a campaign of political terrorism aimed at deterring African-American political participation, including, for instance: attacking an African-American political rally in Mitchell County in 1868, killing and wounding many of the participants; warning African Americans in Wrightsville, Georgia, that "blood would flow" if African Americans exercised their right to vote in an upcoming election; and attacking and beating an African-American man in his own home to prevent him from voting in an upcoming congressional election.

43.    In Georgia's General Assembly, fierce resistance to African-American voting rights led to more discriminatory legislation. In 1871, Georgia became the first state to enact a poll tax. At Georgia's 1877 constitutional convention, the General Assembly made the poll tax permanent and cumulative, requiring citizens

to pay all back taxes before being permitted to vote. The poll tax reduced turnout among African-American voters in Georgia by half. It has been described as the single most effective disenfranchisement law ever passed. The poll tax was not abolished until 1945, after it had been in effect for almost 75 years.

44.    After the poll tax was repealed in 1945, voter registration among African Americans significantly increased. However, as a result of these purposeful voter suppression tactics, between 1908 and 1962, not a single African American served in the Georgia General Assembly.

45.    Georgia's history of voter discrimination is far from ancient history. As recently as 1962, 17 municipalities and 48 counties in Georgia required segregated polling places. When the U.S. Department of Justice filed suit to end the practice, a local Macon leader declared that the federal government was ruining "every vestige of the local government."

46.    Other means of disenfranchising Georgia's African-American citizens followed. Georgia adopted virtually every one of the "traditional" methods to obstruct the exercise of the franchise by African Americans, including literacy and understanding tests, strict residency requirements, onerous registration procedures, voter challenges and purges, the deliberate slowing down of voting by election

officials so that African Americans would be left waiting in line when the polls closed, and the adoption of "white primaries."

47.    Attempts to minimize African-American political influence in Georgia have also tainted redistricting efforts. During the 1981 congressional redistricting process, in opposing a bill that would create a 5th District that was majority-African American, Joe Mack Wilson, a Democratic State representative, openly used racial epithets to describe the district. Speaker of the House Tom Murphy objected to creating a district where an African American would certainly be elected and refused to appoint any African Americans to the conference committee for fear that they would support a plan to allow African-American voters to elect a candidate of their choice.  Several senators also expressed concern about being perceived as supporting the creation of a black congressional district.

48.    Indeed, Georgia's redistricting plans have been invalidated numerous times by federal courts for voting rights violations. In *Georgia v. United States*, 411 U.S. 526 (1973), the Supreme Court affirmed the three-judge district court's decision that Georgia's 1972 reapportionment plan violated Section 5 of the Voting Rights Act, at least in part because it diluted the African-American vote in an Atlanta-based congressional district in order to ensure the election of a white candidate. *See also Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982) (denying pre-clearance based

on evidence that Georgia's redistricting plan was the product of purposeful discrimination in violation of the Voting Rights Act), *aff'd*, 459 U.S. 1166 (1983); *see also Miller v. Johnson*, 515 U.S. 900, 917 (1995) (finding racial gerrymandering in violation of the Fourteenth Amendment).

49.    Due to its lengthy history of discrimination against racial minorities, Georgia became a "covered jurisdiction" under Section 5 of the Voting Rights Act upon its enactment in 1965, meaning any changes to Georgia's election practices or procedures (including the enactment of new redistricting plans) were prohibited until either the U.S. Department of Justice or a federal court determined that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color or [membership in a language minority group]." 52 U.S.C. § 10304(a).

50.    Accordingly, between 1965 and 2013, when the Supreme Court effectively barred enforcement of the Section 5 preclearance requirement in *Shelby County v. Holder*, the federal government's independent oversight helped guard Georgia's minority voters against disenfranchisement and arbitrary and disparate treatment by the State in its election practices and procedures. While Section 5 was in effect, Georgia received more than 170 preclearance objection letters from the U.S. Department of Justice.

51.    What is briefly described here as Georgia's history of race discrimination in voting has been thoroughly documented by historians and scholars. The history is so extensive and well-established that courts have effectively taken judicial notice of it. *See*, *e.g.*, *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("The history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof."); *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."), *aff'd and remanded*, 515 U.S. 900 (1995); *Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013) ("Generally, Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (quoting *Brooks*, 848 F. Supp. at 1560), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015).

**Use of Racial Appeals in Political Campaigns**

52.     In addition to Georgia's history of discrimination against minorities in voting, political campaigns—both historically and in recent elections—have often relied on overt or subtle racial appeals.

53.     In 2016, Tom Worthan, former Republican Chairman of the Douglas County Board of Commissioners, was caught on video making racist comments aimed at discrediting his African-American opponent, Romona Jackson-Jones, and an African-American sheriff candidate, Tim Pounds. During the recorded conversation with a Douglas County voter, Worthan asked, "Do you know of another government that's more black that's successful? They bankrupt you." Worthan also stated, in reference to Pounds, "I'd be afraid he'd put a bunch of blacks in leadership positions," and that "he'd put his black brothers in positions that maybe they're not qualified to be in."

54.     In the 2017 special election for Georgia's Sixth Congressional District, U.S. Rep. Karen Handel's husband shared an image over social media which urged voters to "free the black slaves from the Democratic plantation." The image also stated: "Criticizing black kids for obeying the law, studying in school, and being ambitious as 'acting white' is a trick Democrats play on Black people to keep them poor, ignorant, and dependent."

55.     During that same election, Jere Wood, the Republican mayor of Roswell, which is Georgia's seventh largest city, insinuated that voters in Georgia's Sixth Congressional District—a majority-white district that has been represented by white Republicans Newt Gingrich, Senator Johnny Isakson, Tom Price, and now Karen Handel, over the past three decades—would not vote for Democratic candidate Jon Ossoff in the 2017 special election because he has an "ethnic-sounding" name. When describing voters in the Sixth District, Wood said, "If someone is going down the list, they're gonna vote for somebody who is familiar . . . If you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim? Is he Lebanese? Is he Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever."

56.     On a separate occasion, state senator Fran Millar alluded to the fact that Georgia's Sixth District was gerrymandered in such a way that it would not support electing Jon Ossoff, specifically because he is the former aide to an African-American Congressman. Senator Millar said, "I'll be very blunt. These lines were not drawn to get Hank Johnson's protégé to be my representative. And you didn't hear that . . .  They were not drawn for that purpose, OK? They were not drawn for that purpose."

57.    Earlier in 2017, Tommy Hunter, a member of the board of commissioners in Gwinnett County, the second most populous county in the state, called African-American Representative John Lewis a "racist pig" and suggested that his re-election to the United States House of Representatives is "illegitimate" because he represents a majority-minority district.

58.    And in the 2014 Democratic primary election for House District 105, an unidentified Republican firm reportedly conducted a racially divisive robocall among likely Democratic voters asking if they would prefer to vote for "an Asian businessman or an African American swim mom." The poll was apparently referencing the Asian-American candidate Tim Hur and African-American candidate Renita Hamilton.

59.    These are just a few, more recent examples of the types of racially charged political campaigns that have tainted elections in Georgia throughout the state's history.

### Ongoing Effects of Georgia's History of Discrimination

60.    State-sponsored segregation under Georgia's Jim Crow laws permeated all aspects of daily life and relegated African Americans to second class citizenship. Georgia lawmakers segregated everything from public schools, to hospitals and graveyards. African Americans in Georgia were also precluded from sitting on

juries, which effectively denied African-American litigants equal justice under the law. Moreover, African Americans were excluded from the most desirable manufacturing jobs, which limited their employment opportunities to mostly unskilled, low-paying labor. And in times of economic hardship, African-Americans were the first to lose their jobs.

61.   Decades of Jim Crow and other forms of state-sponsored discrimination—followed by continued segregation of public facilities well into the latter half of the twentieth century, in defiance of federal law—resulted in persistent socioeconomic disparities among African Americans and whites. These disparities, in areas such as education, employment, and health, hinder the ability of African Americans to participate effectively in the political process.

62.   African Americans in Georgia, for instance, are less likely to earn a degree than their white counterparts and have lower levels of educational attainment. According to the U.S. Census Bureau's 2012-2016 American Community Survey 5-Year Estimates, 22.1 percent of African Americans have obtained a bachelor's degree or higher, compared to 33.1 percent of whites.

63.   Further compounding the disparity in educational attainment is the fact that African-American students in Georgia are suspended and expelled at much higher rates. According to the U.S. Department of Education, in the 2011-2012

school year, for instance, African-American males received out-of-school suspensions at more than double the rate of white males, and African-American female students received out-of-school suspensions at a rate five times greater than their white female counterparts.

64.     These racial disparities persist within the criminal justice system as well. Although African Americans comprise just over 30 percent of Georgia's total population, according to the U.S. Department of Justice, Bureau of Justice Statistics, over 60 percent of Georgia's prison population is African American.

65.     Furthermore, according to the Georgia Department of Public Health, African Americans in Georgia experience significantly higher rates of obesity, diabetes, mortality from cardiovascular disease, and infant mortality than the white majority population.

66.     In addition to these disparities in health, education, and criminal justice, African Americans in Georgia lag behind whites in several economic indicators. According to the U.S. Census Bureau's 2012-2016 American Community Survey 5-Year Estimate, the African-American unemployment rate is more than double that of whites, the African-American poverty rate is nearly double that of whites, and rates of homeownership among African Americans are significantly lower than among whites.

## CAUSE OF ACTION

### H.B. 20EX violates Section 2 of the Voting Rights Act

67.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

68.    Section 2 of the Voting Rights Act prohibits the enforcement of any "standard, practice, or procedure" that "results in the denial or abridgement of the right of any U.S. citizen to vote on account of race or color," or membership in a language minority group. 52 U.S.C. § 10301(a).

69.    The congressional district boundaries, as currently drawn, "crack" African-American populations in or around CD 12 with the effect of diluting African-American voting strength, in violation of Section 2 of the Voting Rights Act.

70.    African Americans in the areas in or around CD 12 are sufficiently numerous and geographically compact to constitute a majority of eligible voters in an additional congressional district.

71.    Under Section 2 of the Voting Rights Act, the Georgia General Assembly was required to create an additional congressional district in which African Americans would have the opportunity to elect their candidates of choice.

72.     African-American voters in Georgia, particularly in the areas in or around CD 12, are politically cohesive. Elections in this area reveal a clear pattern of racially polarized voting that allows the bloc of white voters usually to defeat African Americans' preferred candidates.

73.     The totality of the circumstances establishes that the current congressional map has the effect of denying African-American voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

74.     By engaging in the acts and omissions alleged herein, Defendant has acted and continues to act to deny Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act. Defendant will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.     Declare that H.B. 20EX violates Section 2 of the Voting Rights Act;

B.     Issue a permanent injunction enjoining Defendant, as well as his agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional districts as drawn in H.B. 20EX, including an

injunction barring Defendant from conducting any further congressional elections under the current map;

C.      Hold hearings, consider briefing and evidence, and otherwise take actions necessary to order the adoption of a valid congressional redistricting plan that includes an additional district in or around CD 12 in which African Americans would have an opportunity to elect their preferred candidates, as required by Section 2 of the Voting Rights Act;

D.      Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated:  June 13, 2018

Respectfully submitted,

*s/ Adam M. Sparks*
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 W. Peachtree St., NW; Suite 3250
Atlanta, GA 30309
Email: sparks@khlawfirm.com
Email: hknapp@khlawfirm.com
Phone: (404) 888-9700
Fax: (404) 888-9577

Marc Erik Elias*
Bruce V. Spiva*
Uzoma N. Nkwonta*
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: UNkwonta@perkinscoie.com

Abha Khanna*
**Perkins Coie, LLP**
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com
*Attorneys for Plaintiffs*
*Pro hac vice application pending