# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| PAMELIA DWIGHT, an individual;<br>BENJAMIN DOTSON, an individual;<br>MARION WARREN, an individual;<br>AMANDA HOLLOWELL, an individual;<br>DESTINEE HATCHER, an individual; and<br>WILBERT MAYNOR, an individual,<br><br>     Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his<br>official capacity as Secretary of State of<br>the State of Georgia,<br><br>     Defendant. | Civil Action No. 1:18-cv-2869-RWS |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.     Introduction

Section 2 of the Voting Rights Act ensures that minority groups have an equal opportunity to participate in the political process and elect candidates of their choice—whomever those candidates may be. It is no defense to suggest, as Defendant does, that enforcing the Voting Rights Act will benefit his political opponents; the rights of African-American voters do not receive any less protection by virtue of whom they choose to support, and elected officials are not exempt from the obligation to "pull, haul, and trade" to meet the needs and win the approval of the very people whom they seek to represent. *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994).[1] Plaintiffs, thus, filed this lawsuit to enforce their right to participate in the political process protected by Section 2, and challenge the continued use of a congressional districting plan that strategically carved African-Americans voters out of Georgia's 12th Congressional District ("CD 12"), dispersed them into neighboring districts, and imported white voters to change the district's racial composition.

---

[1] Plaintiff Marion Warren, although a Democrat, testified that he would vote for a different party if it had a platform that was responsive to African-American needs. Plaintiffs' Second Statement of Undisputed Material Facts ("Pls.' Second SUMF") ¶ 16 (Deposition of Marion Warren at 63:11-64:2, Second Declaration of Abha Khanna ("Second Khanna Decl.") Ex. 1).

Defendant seeks dismissal of Plaintiffs' claims but advances legally-flawed arguments that should be rejected outright. First, Plaintiffs' lawsuit is not barred by laches, as Defendant fails to establish that laches even applies to claims seeking prospective injunctive relief. Defendant also ignores the fact that Plaintiffs filed suit after only two consecutive elections in which the African-American-preferred candidate in CD 12 was defeated, Pls.' SUMF, Dkt. 66-2 at ¶ 64 (Palmer Report at 6–8, tbls. 1–5, Dkt. 66-8), and that Plaintiff Destinee Hatcher joined this lawsuit shortly after her return to Georgia after attending college out of state, Pls.' Second SUMF ¶¶ 13-14 (Deposition of Destinee Hatcher ("Hatcher Dep.") at 13:9–15:1, 37:15–20, Second Khanna Decl. Ex. 3; Declaration of Destinee Hatcher ("Hatcher Decl."), Second Khanna Decl. Ex. 4). Defendant further fails to acknowledge Plaintiffs' claim for declaratory relief, which is not subject to laches. *Sanders v. Dooly County, Ga.*, 245 F.3d 1289, 1291 (11th Cir. 2001) (per curiam).

Second, Plaintiffs' illustrative plans clearly demonstrate that African Americans in central-southeast Georgia are sufficiently numerous and geographically compact to form a majority in a congressional district. *See Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). The illustrative majority-minority district in all three plans proposed by Plaintiffs are in the same location as the current CD 12; they comply with traditional redistricting principles; and they do not decrease the

black voting age population in CD 2 as compared to the benchmark, 2005 plan. Defendant's arguments to the contrary misapply the relevant legal standards and rely on the wrong metrics in calculating changes to the African-American population in CD 12 and CD 2.

Finally, the proportionality of majority-minority districts (compared to the total minority population) is "never dispositive," and is just one of at least seven factors or more to be considered by the Court under the totality of the circumstances test. *De Grandy*, 512 U.S. at 1025 (O'Connor, J., concurring); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 436 (2006) (*LULAC*). Defendant's argument for dismissal on this ground contradicts controlling caselaw and is meritless.

For these reasons, as explained further below, Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment.

## II.    The Doctrine of Laches Does Not Bar Plaintiffs' Claim

The equitable doctrine of laches is an affirmative defense; as such, the Defendant must prove its elements by a preponderance of the evidence, rather than advance unsupported inferences or conclusory assertions about its application to Plaintiffs' lawsuit. At the outset, Defendant fails to establish that laches even applies in a case, such as this, seeking prospective injunctive relief, and even if it did apply,

Defendant erroneously paints all Plaintiffs with a broad brush, ignoring the unique factual circumstances of their claims. Defendant also fails to distinguish between the consequences of an adverse ruling on the merits and the harm occasioned by Plaintiffs' alleged delay, relying solely on the former and ignoring the latter, which is the true focus of the prejudice inquiry. Finally, even if laches applied to this case, which it does not, it would not bar Plaintiffs' claim for declaratory relief.

### A.    The Doctrine of Laches Does Not Apply to Voting Rights Actions Seeking Prospective Injunctive Relief.

Because laches "may not be used as a shield for future, independent violations of the law," *Cheshire Bridge Holdings, LLC v. City of Atlanta, Ga.*, No. 1:15-cv-3148-TWT, 2018 WL 279288, at *9 (N.D. Ga. Jan. 3, 2018) (quoting *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 1005, n.32 (5th Cir. 1981)), it should not be used to deny Plaintiffs their right to an undiluted vote in a *future* election. *Cf. Peter Letterese & Assoc., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1321 (11th Cir. 2008) ("[L]aches serves as a bar only to the recovery of retrospective damages, not to prospective relief"). This reasoning has led several federal courts—including in Georgia—to hold that laches does not apply to voting rights claims seeking injunctive relief. *Miller v. Bd. of Comm'rs of Miller Cty.*, 45 F. Supp. 2d 1369, 1373 (M.D. Ga. 1998); *see also Garza v. Cty. of L.A.*, 918 F.2d 763, 772 (9th Cir. 1990) (same); *Smith v. Clinton*, 687 F. Supp. 1310, 1312–13 (E.D. Ark. 1988) (same).

Courts in two other recent redistricting (partisan gerrymandering) cases reaffirmed this principle. Just last month, the Eastern District of Michigan ruled that laches did not apply to voting-rights claims seeking declaratory and injunctive relief. *League of Women Voters of Michigan v. Benson*, No. 2:17-CV-14148, 2019 WL 1856625, at *25 (E.D. Mich. Apr. 25, 2019). And last year, the Southern District of Ohio reasoned that because the plaintiffs were seeking prospective relief, not "a remedy for any harm that they alleged occurred prior to the filing of their lawsuit," laches could not apply. *Ohio A. Philip Randolph Institute v. Smith*, 335 F. Supp. 3d 988, 1002 (S.D. Ohio 2018) (citing *Nartron Corp. v STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002)).

As several of these courts have explained, voting-rights plaintiffs' injuries are "ongoing" because each election operated under an unlawful regime imposes a new, discrete injury. *Garza*, 918 F.2d at 772; *Smith*, 687 F. Supp. at 1312–13. This reasoning applies equally when there is one election left in a redistricting cycle. *Luna v. Cty. of Kern*, 291 F. Supp. 3d 1088, 1144 (E.D. Cal. 2018) (Section 2 Voting Rights Act case not barred by laches because "plaintiffs have demonstrated an ongoing violation of § 2 of the Voting Rights Act," where one election remained before already-scheduled redistricting).

Contrary to Defendant's assertion, the Eleventh Circuit has yet to resolve directly whether laches applies to voting rights claims seeking prospective injunctive relief. The Eleventh Circuit's ruling in *Sanders*, merely stated that the district court did not abuse its discretion in finding that the elements of laches were met. 245 F.3d at 1291. Defendant, however, misquotes *Sanders*, falsely attributing to that opinion the statement that "[r]edistricting challenges are subject to the doctrine of laches because of the ten-year expiration date of electoral districts." Mot. at 10. That quote appears nowhere in the *Sanders* opinion, and the Eleventh Circuit has said no such thing. The *Sanders* ruling simply does not bind the Court to apply laches here.

Nor should the Court seek guidance from the non-binding decisions of other jurisdictions upon which Defendant relies. In *White v. Daniel*, 909 F.2d 99, 103 (4th Cir. 1990), plaintiffs filed suit months *after* the last election under the challenged plan took place, and over seventeen years after the challenged plan was adopted. The court's ruling in that case relied in part on the recognition that "court-ordered reapportionment . . . would be completely gratuitous[] because there are no elections scheduled" before the next redistricting. *Id.* at 104. While these equitable considerations counseled against judicial relief in *White*, they stand in stark contrast to Plaintiffs' requested relief ahead of the 2020 elections.

Similarly, *Chestnut v. Merrill* is neither controlling nor instructive. There, an Alabama district court concluded that laches applied to a redistricting action because of the ten-year expiration date of electoral districts, yet did not explain why this fact warrants departure from the Eleventh Circuit's admonition that "laches serves as a bar only to the recovery of retrospective damages, not to prospective relief." *Peter Letterese & Assocs.*, 533 F.3d at 1321. While the Alabama court relied on *Sanders*, which, as explained above, did not address the question at hand, binding precedent before and after *Sanders* establishes that laches is inapplicable to such claims. *See*, *e.g.*, *Envtl. Def. Fund*, 651 F.2d at 1005, n.32[2]; *Peter Letterese & Assocs.*, 533 F.3d at 1321. The Court should therefore follow the Eleventh Circuit's clear statement on the specific question presented here—whether laches bars prospective injunctive relief—rather than infer, as Defendant does, that the Eleventh Circuit silently overruled prior precedent by implication. *Cf. Main Drug, Inc. v. Aetna U.S. Healthcare, Inc.*, 475 F.3d 1228, 1230 (11th Cir. 2007) (refusing to "extrapolat[e] from [an opinion's] implications a holding on an issue that was not before that Court in order to upend settled circuit law"); *In re Air Crash Off Long Island, NY, on July*

---

[2] *Environmental Defense Fund v. Marsh* was decided on July 13, 1981, and is thus binding on this Court. *See*, *e.g.*, *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

*17, 1996*, 209 F.3d 200, 211 (2d Cir. 2000) ("[P]arenthetical reference, in a case that did not involve the [issue before the court] cannot be read to overrule the clear statements of this court . . . .").

As the state official responsible for promoting and supporting accurate, fair, open, and secure elections for the citizens of Georgia, Defendant can hardly dispute the significance of each and every election, whether it is the first held in a redistricting cycle or the last. The November 2020 congressional elections will have very real consequences for Georgia residents—and impose very real injury on Plaintiffs.

### B. Defendant Cannot Establish that Plaintiffs Unreasonably Delayed in Filing This Lawsuit.

Even if the affirmative defense of laches applied here, Defendant has not met his burden of proving any of its elements: (1) a delay in asserting a right or claim, which (2) was not excusable, and (3) caused undue prejudice to defendant. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir. 1986). In his attempt to demonstrate an unreasonable delay, Defendant ignores key factual distinctions among the individuals that filed this lawsuit and argues generally that redistricting plaintiffs should know they have a provable claim immediately upon passage of a plan. But the Eleventh Circuit has repeatedly rejected this "sue first and ask questions later" approach to laches. *Kason Indus. Inc. v. Component Hardware*

*Group, Inc.*, 120 F.3d 1199, 1206 (11th Cir. 1997). Instead, "a plaintiff's reasonable need to fully investigate its claims" excuses delay; to hold otherwise "would create a powerful and perverse incentive for plaintiffs to file premature and even frivolous suits to avoid the invocation of laches." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1285 (11th Cir. 2015).[3]

Defendant's already unpersuasive argument that Plaintiffs should have known their claim was ripe *before* the 2012 election is especially weak when applied to Plaintiffs Pamelia Dwight and Wilbert Maynor, both of whom live in CD 12 where the African-American-preferred incumbent, John Barrow, was able to hold on to his seat until the 2014 general election. Pls.' Second SUMF ¶¶ 6, 7 (Palmer Report at 7); *id.* at ¶ 15 (Second Khanna Decl. Ex. 2, Deposition of Pamelia Dwight at 6:13-20). It was not until the 2014 election, at the earliest, that the inability of African Americans to elect their preferred candidates in CD 12 materialized. Pls.' SUMF ¶ 64 (Palmer Report at 6–8, tbls. 1–5). Plaintiffs' decision to file this lawsuit after *just two* elections in which their preferred candidates lost is not the type of

---

[3] *See also Thomas v. Bryant*, 366 F. Supp. 3d 786 (S.D. Miss.), appeal dismissed, 755 F. App'x 421 (5th Cir. 2019) (rejecting laches defense in Section 2 Voting Rights Act lawsuit, filed in July 2018, challenging map adopted in 2012); *Jeffers*, 730 F. Supp. at 203, *aff'd*, 498 U.S. 1019 (1991) (action not barred by laches despite only one election remaining before redistricting and nine years since most recent census); *Agre v. Wolf*, Case No. 2:17-cv-04392-MMB, ECF No. 83 (E.D. Penn. Nov. 16, 2017) (rejecting laches defense in lawsuit, filed in 2017, challenged 2011 map).

unreasonable delay contemplated by the equitable doctrine of laches, *see, e.g., Davis v. Bandemer*, 478 U.S. 109, 135 (1986) (plurality opn.) ("Relying on a single election to prove unconstitutional discrimination is unsatisfactory."), and distinguishes the timing of this lawsuit from the alleged delay in *Chestnut*. 2019 WL 1376480, at *6; *see also Householder*, 2019 WL 1969585, at *128–29 ("[I]t would have been unwise for Plaintiffs to bring [an] action" challenging a map after just one set of election results).

Indeed, two key elements of Plaintiffs' claim require proof that specific events occur with regularity: (1) that the "minority group members usually vote for the same candidates," and (2) the presence of "a white bloc vote that normally will defeat" the minority group's candidate of choice. *Gingles*, 478 U.S. at 56. When applied to Plaintiffs Dwight and Maynor, Defendant essentially argues that Plaintiffs must file suit even before the white bloc defeats their candidate of choice, completely disregarding a plaintiff's need to investigate and prepare her legal claims. *See Smith*, 687 F. Supp. at 1313 (denying laches argument based on time needed to develop evidence of Voting Rights Act violation); *Benson*, 2019 WL 1856625, at *26 (holding voters "did not act unreasonably by waiting until three elections had been held to sue"); *Householder*, 2019 WL 1969585, at *129 (denying laches defense where case was filed seven years after map went into effect and after four elections

had passed, in part because "more data . . . give[s] us greater confidence in our finding"); *cf. LULAC*, 548 U.S. at 420  (opinion of Kennedy, J.) (rejecting challenge to recently adopted map where only one election had taken place and noting that the Supreme Court is "wary" of adopting a standard that would assess "a hypothetical state of affairs").

Finally, Defendant's one-size-fits-all theory of laches falls apart when applied to Plaintiff Destinee Hatcher. Ms. Hatcher registered to vote for the first time in 2014 but attended college out-of-state until shortly before this case was filed. Pls.' Second SUMF ¶ 13 (Hatcher Dep. at 13:9–11, 14:21–15:1); *id.* (Hatcher Decl.). She only decided to pursue this lawsuit "[w]hen [she] moved back home and saw that [her] community was basically being neglected. . . . just a lot of neglect for people that looked like [her] as African-Americans." *Id.* at ¶ 14 (Hatcher Dep., 14:21–15:1, 37:15–20).

In arguing that Ms. Hatcher should have sued immediately upon registering and voting in 2014, Defendant fails, once again, to appreciate that Plaintiffs' lawsuit is not just about wins at the ballot box. Rather, "[t]he Voting Rights Act is concerned with political responsiveness," *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1573 (11th Cir. 1984), which is also one of the factors that may be considered under Section 2's totality of the circumstances test. *See*, *e.g.*, *Ga. State Conf. of*

*NAACP v. Fayette Cty. Bd. of Comm'rs*, 952 F. Supp. 2d 1360, 1368 (N.D. Ga. 2013). This lack of responsiveness "for people that looked like [her]," which drove Ms. Hatcher to pursue this lawsuit in the first place, Pls.' Second SUMF ¶ 14 (Hatcher Dep. at 37:15–20), became apparent upon her return to Georgia shortly before this case was filed. *Id.* (Hatcher Dep. at 14:14–15:1, 37:15–20). Like all litigants, Ms. Hatcher is not required to "search and destroy every conceivable potential [voting rights violation]," *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019) (citation omitted); she is, however, entitled to investigate and prepare her claim. *Black Warrior*, 78 F.3d at 1285. Laches is plainly inapplicable here.

### C.    Defendant Has Not Identified Any Undue Prejudice Attributable to the Alleged Delay in Filing this Lawsuit.

Compounding the absence of any unreasonable delay, Defendant has also failed to identify prejudice caused by the *timing* of this lawsuit. To satisfy this element, Defendant must demonstrate harm that is attributable specifically to Plaintiffs' alleged delay, and courts have drawn a clear distinction between prejudice caused by the delay in asserting one's rights and "the consequences of an adverse decision on the merits." *Black Warrior*, 781 F.3d at 1286; *see also Jeffers*, 730 F. Supp at 203 ("[T]he expense, trouble, and disruption [of redistricting] are not a consequence of plaintiffs' delay in filing"; rather, they "would have occurred

whenever the suit was filed"). In other words, the party invoking laches must establish that he or she was "made significantly worse off because [Plaintiffs] did not bring suit as soon as [they] had the opportunity to do so." *Black Warrior*, 781 F.3d at 1286.

What Defendant describes as "prejudice" are simply consequences of an adverse ruling on a Section 2 claim that would have occurred even if the lawsuit were filed in 2011. He contends that Plaintiffs' action would result in multiple redistrictings within a short period of time and based on allegedly outdated census figures. Mot. at 13–14. But that would be true of a successful claim filed earlier in the decade, which potentially would have required back-to-back redistricting in 2011 and 2012 or 2013. *See Shuford v. Ala. State Bd. of Educ.* 920 F. Supp. 1233, 1239–40 (M.D. Ala. 1996) (rejecting laches defense, finding "defendants have not shown a reason why it would be more difficult to litigate a § 5 claim" at the time plaintiffs filed suit "than it would have been if the claim had been raised at the time the [change in election practice or procedure occurred]"). In *Cox v. Larios*, for instance, the court's 2004 invalidation of Georgia's 2002 state legislative reapportionment plan resulted in the State redistricting in both 2002 *and* 2004. 300 F. Supp. 2d 1320 (N.D. Ga. 2004), *aff'd* 542 U.S. 947 (2004). "Back-to-back" redistricting—even without

the benefit of up-to-date census data[4]—is an inevitable consequence of protecting the right to vote when the legislature fails to get it right the first time. *Pac for Middle Am. v. State Bd. of Elections*, No. 95 C 827, 1995 WL 571887, at \*5 (N.D. Ill. Sept. 22, 1995) (rejecting laches defense and holding that "defendants['] contention that all of the congressional districts may need to be redrawn is not a prejudicial consequence of the plaintiffs' delay" but rather "the natural and inevitable result of a decision in plaintiffs' favor").

It is neither prejudicial nor uncommon to redraw electoral districts in Georgia, even late in the decennial cycle. In fact, the General Assembly voluntarily initiated and implemented the same types of mid-census redistricting efforts for state legislative districts that Defendant now claims would unduly burden the State's election apparatus. Following the 2010 census, the General Assembly redrew or amended its State House of Representatives map in 2011, 2012, 2015, and proposed but failed to pass another modified plan in 2017. *See Thompson v. Kemp*, 309 F.

---

[4] These cases also demonstrate that the absence of up-to-date Census data should not preclude a court from affording relief to African-American voters who have been denied the right to participate equally in the political process. It would make little sense to reject a remedial map as "prejudicial" based on its use of 2010 Census data, while permitting the continued use of an unlawful districting plan that relies on the same 2010 Census data. Further, it is well-recognized that prior Census figures are "the relevant data for assessing a claim under Section [2]." *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991).

Supp. 3d 1360, 1362 (N.D. Ga. 2018). Aside from vague references to a "new voting system," Mot. at 13—the import of which is not explained anywhere in the record—Defendant provides no reason why the relief requested here would be any more burdensome than the mid-cycle redistricting Georgia already engages in, or a court-ordered redistricting implemented at any other time in the decennial cycle.

## D. Defendant's Laches Argument Does Not Apply to Plaintiffs' Claim for Declaratory Relief.

Finally, even if the Court finds that laches bars Plaintiffs' claim for injunctive relief, it does not bar Plaintiffs' claim for declaratory judgment. *See Sanders*, 245 F.3d at 1291; *Chestnut*, 2019 WL 1376480, at *7–8. As the Eleventh Circuit acknowledged in *Sanders*, none of the grounds for prejudice associated with late-decade redistricting would apply to a claim for a declaration that the current redistricting map is unlawful. *See Sanders*, 245 F.3d at 1291. Therefore, notwithstanding Defendant's laches defense, Plaintiffs' claim for declaratory judgment precludes the dismissal of this action.

## III. Plaintiffs' Illustrative Plans, Which Include a Compact, Majority-Minority District in Central and Southeast Georgia, Satisfy *Gingles* 1

Plaintiffs satisfied the first *Gingles* precondition ("*Gingles* 1") by submitting illustrative plans of a compact majority-minority district in central and southeast Georgia that comply with traditional redistricting principles. The *Gingles* 1 inquiry

presents two questions. The first is a straightforward numerical inquiry: do African Americans "make up more than 50 percent of the voting-age population" in Plaintiffs' proposed CD 12? *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009). The second asks whether Plaintiffs can offer a majority-minority district that complies with traditional redistricting principles. *See Ga. State Conference of NAACP*, 952 F. Supp. 2d at 1364 ("[A] plan is compact where it is designed 'consistent with traditional districting principles.'") (quoting *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998)). Each of Plaintiffs' three proposed plans satisfy both inquiries. *See* Pls.' Mot. at 10–19.

### A.   Plaintiffs' Illustrative Plans Do Not Result in Retrogression.

Defendant does not and cannot dispute that the black voting age population ("BVAP") in all three illustrative districts exceeds 50 percent. Instead, he distorts the relevant legal standards and commits a series of critical legal errors, to arrive at the erroneous conclusion that Plaintiffs' illustrative plans would lead to "retrogression" in a different congressional district by reducing the percentage of black, *registered* voters in CD 2. This argument lacks merit for several reasons.

First, the illustrative plans do not result in any "retrogression" in CD 2 because, as Defendant admits, African Americans in that district have consistently elected their candidate of choice, since 1992, with significantly lower black voting

age populations. Mot. at 18; Pls.' Second SUMF ¶ 2 (Second Khanna Decl. Ex. 5, Deposition of Gina H. Wright ("Wright Dep.") at 160:8-161:19). While Defendant appears to suggest that any decrease in African-American voters in CD 2 would be retrogressive, that argument collapses under well-settled precedent that defines the principle of retrogression as a "decrease [in] African-American voters' opportunities to elect candidates of choice." *Georgia v. Ashcroft*, 204 F. Supp. 2d 4, 12 (D.D.C. 2002). Tellingly, Defendant's Motion makes no fewer than five references to "retrogression," but conspicuously fails to indicate whether the increase in the minority population in CD 2 was actually necessary to maintain the ability to elect their preferred candidate, or whether the changes to CD 2 under Plaintiffs' illustrative plans actually diminish the ability of African Americans to elect their preferred candidates. Defendant's expert, the architect of the 2011 Plan, testified that it does not, and she *did not* increase the African American registered voter population in CD 2 to comply any legal requirement. *See* Pls.' Second SUMF ¶ 3 (Wright Dep. at 92:4-20, 164:14-21).

Piling one legal error on another, Defendant's retrogression argument relies on the wrong benchmark to assess changes to the African-American population in CD 2. In determining whether a plan is retrogressive, the appropriate benchmark is the last *legally-enforceable* plan. *See* 28 C.F.R. § 51.54 (Procedures for the

administration of Section 5 of the Voting Rights Act); *see also Colleton Cty. Council v. McConnell*, 201 F. Sup. 2d 618, 644 (D.S.C. 2002); *Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035, 1042 (D.S.D. 2005). Defendant's Motion incorrectly compares the percentage of African-American registered voters in CD 2 under Plaintiffs' illustrative plans with the corresponding statistics under the current plan. *See Johnson v. Miller*, 929 F. Supp. 1529, 1567 (S.D. Ga. 1996) (finding an unconstitutional 1992 plan inappropriate as a benchmark for assessing retrogression in a remedial plan and relying on the 1982 plan instead). But here, the 2005 plan— which would be the last legally-enforceable comparator should the Court find the current plan violates Section 2—is the appropriate benchmark for any retrogression analysis. *See id*. Allowing a state to use its own unlawful plan as a benchmark would give jurisdictions license to pack districts in violation of the Voting Rights Act, and then turn around and oppose as retrogressive all remedial measures that unpack those districts, thereby entrenching the dilution of minority votes.

Not only is the 2011 Plan the wrong benchmark for comparison, the percentage of registered African Americans reported in Defendant's Motion is the wrong statistic.[5] The Eleventh Circuit has made clear that "the proper statistic for

---

[5] Defendant's calculations of the percentage of registered voters, moreover, are incorrect. In calculating the proportion of registered voters that are African

deciding whether a minority group is sufficiently large and geographically compact is voting age population" ("BVAP"). *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1568-69 (11th Cir. 1997) ("[E]very member of the *Solomon* Court agreed that the district court had erred in focusing on registered voter statistics instead of voting age population statistics."); *see also Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) ("In majority-minority districts, a minority group composes a numerical, working majority of the voting-age population."); *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1360 n.7 (N.D. Ga. 2014) (citing cases). BVAP is also the appropriate benchmark statistic when assessing whether a remedial plan complies with the non-retrogression principle. *See Smith v. Cobb Cty. Bd. of Elections & Registrations*, 314 F. Supp. 2d 1274, 1297-98 (N.D. Ga. 2002) ("[T]he appropriate benchmark should be the BVAP . . .").[6]

---

American in the relevant districts, Ms. Wright erroneously assumed that *none* of the voters whose race is listed as "unknown"—a group of people constituting roughly ten percent of the state's voters—are African American. Second Cooper Report ¶ 15. There is no basis for that assumption, and as a result, Ms. Wright significantly underestimates this figure. *See* Pls.' Second SUMF ¶ 9 (Second Khanna Decl. Ex. 6, Deposition of William Cooper at 143:1–145:1).

[6] Notably, in a prior submission to this Court, Defendant stressed that *Gingles* 1 "requires that Plaintiffs constitute a majority of the voting age population in a geographically compact district" and argued that Plaintiffs' claims should be dismissed for failure to allege that CD 12 can be drawn "in a manner that increases the African-American *voting age population* above 50% . . . ." Def.'s Mem. in Supp. of Mot. to Dismiss, Dkt. 13-1, at 6, 7 (emphasis in original).

After sifting through the legal errors in Defendant's retrogression analysis, it becomes clear that Plaintiffs' illustrative districts satisfy *Gingles* 1 and do not result in any retrogression. As the chart below demonstrates, all three illustrative plans increase the BVAP in CD 12, based on 2010 census data, without any corresponding decrease in CD 2.

| District | 2005 Plan | Plaintiffs' Plan 1 | Plaintiffs' Plan 2 | Plaintiffs' Plan 3 |
|----------|-----------|--------------------|--------------------|--------------------|
| CD 2 | 46.84% | 46.92% | 47.03% | 46.89% |
| CD 12 | 41.50% | 50.32% | 50.25% | 50.20% |

Pls.' Second SUMF ¶ 8 (Cooper Report, fig. 10, Exs. H-2, I-2, Dkt. 66-4; Cooper Rebuttal Report, Ex. B-2, Dkt. 66-6). There is no reasonable dispute that African Americans in CD 2 can elect their candidates of choice under Plaintiffs' illustrative plans, nor is there any question that the addition of African-American voters to CD 2 under the current plan was unrelated to any concern about their voting strength. *See* Pls.' Second SUMF ¶¶ 1-3 (Wright Dep. 92:4-20; 161:4-19, 164:15-21).

**B.    The African-American Communities in Plaintiffs' Illustrative Plans Are Sufficiently Numerous and Geographically Compact to Satisfy *Gingles* 1.**

Defendant further contends that the African-American community in Plaintiffs' illustrative CD 12 is not geographically compact, yet fails to identify or propose any legal standard for assessing the community's compactness. As Plaintiffs explained in their Memorandum in Support of Plaintiffs' Motion for Partial

Summary Judgment, a proposed district's compliance with the numerosity requirement and with traditional redistricting principles is sufficient to satisfy *Gingles* 1. (Dkt. 66-1, at 12-19); *see also Ga. State Conf. of NAACP*, 952 F. Supp. 2d at 1364 (acknowledging that "a plan is compact [under *Gingles* 1] where it is designed 'consistent with traditional districting principles'") (quoting *Chiles*, 139 F.3d at 1425). For the reasons set forth in Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Mot."), the illustrative plans comply with traditional districting principles and satisfy the *Gingles* 1 compactness inquiry. Pls.' Mot. at 12-19.

Defendant, moreover, cites no authority for the proposition that Plaintiffs must identify a uniting factor for every African-American population center that appears in an illustrative district. In fact, the Supreme Court's decision in *LULAC* rejects this overly-restrictive interpretation of *Gingles* 1. The Court "accept[ed] that in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." *LULAC*, 548 U.S. at 435.The Court also "emphasize[d] it is the enormous geographical distance separating the Austin and Mexican-border communities, *coupled* with the disparate needs and interests of these populations—*not either factor alone*—that renders [the proposed district] noncompact for § 2 purposes." *Id.* (emphasis added). Here, the minority

communities in the illustrative districts are all located in central-southeast Georgia, in the same region that CD 12 has traditionally occupied. Defendant's expert, Gina H. Wright, who drew the current congressional districting plan, agrees; she testified that Plaintiffs' illustrative CD 12s are "in the same east central Georgia [location] that the current [CD] 12 is." Pls.' Second SUMF ¶ 10 (Wright Dep. 49:16-51:6; 244:8-14). Defendant's Motion provides no plausible basis to suggest that the African-American communities in the illustrative districts have disparate needs or are too far apart to form a compact CD 12.

What is more troubling is the double-standard that Defendant implicitly adopts for the State of Georgia, and for minority plaintiffs seeking relief from a districting plan that dilutes their votes. Defendant's expert, Ms. Wright—who, again, drew the current congressional districting plan—testified that "on a congressional map, the communities of interest is not as high of a priority . . . because they are so large in size." *Id.* at ¶ 11 (Wright Dep. 65:22-66:4). She further clarified: "I don't know that communities of interest is normally a conversation that's being held about a congressional map." *Id.* at ¶ 12 (Wright Dep. 66:20-22). Her testimony not only illustrates the unfounded nature of Defendant's criticisms, it suggests that identifying common interests among all population centers is not important to the State when adopting a plan that cracks African-American communities, *see* Pls.'

Mot. at 2–3, yet it stands as a barrier to relief for Plaintiffs who seek to enforce the Voting Rights Act. None of the authorities presented by Defendant endorses such a result.[7]

## IV. Defendant's Attempt to Circumvent Section 2's Totality of the Circumstances Test Is Legally Erroneous

Despite acknowledging the Supreme Court's repeated admonitions that proportionality is not dispositive in Section 2's totality of the circumstances test, Defendant argues, *in a dispositive motion*, that proportionality ends this case. This argument is particularly puzzling in light of his admission that "proportionality is not a safe harbor for a jurisdiction," Mot. at 23, and Supreme Court precedent that rejects this exact claim. *See De Grandy*, 512 U.S. at 1017–18 (rejecting state's argument that "no dilution occurs whenever the percentage of single-member

---

[7] To the extent Defendant suggests that the illustrative plans are racial gerrymanders, Mot. at 20 n.5, that argument fails because a plaintiff need not demonstrate that a proposed remedy district is not a racial gerrymander to satisfy the *Gingles* preconditions. *See, e.g., Ga. State Conf. of NAACP*, 952 F. Supp. 2d at 1365 (rejecting defendant's argument that the court was required to determine if proposed map amounted to racial gerrymander to satisfy *Gingles* preconditions). In any event, Section 2 "require[s] plaintiffs to show that it is possible to draw majority-minority voting districts," so race will "certainly" be a factor in designing proposed subdistricts. *Chiles*, 139 F.3d at 1424, 1426. But as discussed above, the districts were drawn in compliance with traditional districting principles, and there is no evidence that those principles were subordinated to race. Defendant's claim to the contrary that "Plaintiffs only considered race" citing Cooper Dep. at 105:24-106:12 is plainly false.

districts in which minority voters form an effective majority mirrors the minority voters' percentage of the relevant population"). As the Court explained, such an "inflexible rule would run counter to the textual command of § 2, that the presence or absence of a violation be assessed 'based on the totality of circumstances.'" *Id.* at 1018 (citing 42 U.S.C. § 1973(b)). Thus, proportionality is "*never* itself dispositive" of the totality of the circumstances test. *Id.* at 1025 (O'Connor, J., concurring) (emphasis in original); *see also LULAC*, 548 U.S. at 436 ("[Proportionality] does not . . . act as a 'safe harbor' for States in complying with § 2.").[8]

Furthermore, Defendant's undue focus on proportionality—and his repeated reliance on African-American electoral success in other corners of the state—fundamentally misunderstands Section 2 of the Voting Rights Act. The Supreme Court has made clear that "the right to an undiluted vote" under Section 2 "does not belong to the minority as a group," and thus "a State may not trade off the rights of some members of a racial group against the rights of other members of that group."

---

[8] Neither of the two out-of-circuit cases Defendant briefly cites discussing proportionality are any more persuasive. In *African American Voting Rights Legal Defense Fund, Inc. v. Villa*, the Eight Circuit reaffirmed the well-established principle that under the totality of the circumstances test, the "proportionality factor [is] one of several factors," stating "we admonish district courts to take care and include all circumstances that go into the 'totality' when these circumstances are placed in issue." 54 F.3d 1345, 1355–56 (8th Cir. 1995); *see also Fairley v. Hattiesburg, Miss.*, 662 F. App'x 291, 300–01 (5th Cir. 2016) (noting that district court considered proportionality as one factor in the totality of the circumstances).

*LULAC*, 548 U.S. at 437 (internal quotations and citations omitted); *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) ("The vote-dilution injuries suffered [by some black voters] are not remedied by creating a safe majority-black district somewhere else in the State."). That African-American voters in Atlanta may have opportunities to elect their preferred candidates hardly justifies depriving African-American voters in central and southeastern Georgia of that same opportunity.

Proportionality is just one of the numerous enumerated and unenumerated factors in Section 2's totality of the circumstances test. Granting summary judgment on this basis would contradict controlling case law and would ignore every other factor in Section 2's totality of the circumstances test.

## V.    Conclusion

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment.

Dated:  May 29, 2019

Respectfully submitted,

By /s/ *Uzoma N. Nkwonta*
Marc Erik Elias*
Bruce V. Spiva*
Uzoma N. Nkwonta*
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: UNkwonta@perkinscoie.com

Abha Khanna*
**Perkins Coie, LLP**
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 W. Peachtree St., NW; Suite 3250
Atlanta, GA 30309
Email: hknapp@khlawfirm.com
Email: sparks@khlawfirm.com
Phone: (404) 888-9700
Fax: (404) 888-9577

*Attorneys for Plaintiffs*
*Admitted pro hac vice

- 26 -

## **LOCAL RULE 7.1(D) CERTIFICATION OF COMPLIANCE**

I certify that this pleading has been prepared with Times New Roman 14 point,

as approved by the Court in L.R. 5.1(C), N.D. Ga.

Respectfully submitted, this 29th day of May, 2019.

/s/ *Uzoma Nkwonta*
Counsel for Plaintiffs
**PERKINS COIE, LLP**
700 Thirteenth St., N.W., Ste. 600
Washington, DC  20005-3960
Telephone: (202) 654-6338
Facsimile: (202) 654-9106
Email: UNkwonta@perkinscoie.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2019, I filed a copy of the foregoing Opposition to Defendant's Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Uzoma N. Nkwonta
Uzoma N. Nkwonta
**Perkins Coie, LLP**
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: UNkwonta@perkinscoie.com